JUDGE SCHOFIELD

14 CV 5223

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------X

Thomas Au, Tung Au, and Isabel Au

PLAINTIFFS,

**COMPLAINT**

-against-

Rudolph Carryl,
Carryl Capital Management LLC.

DEFENDANTS.

---------------------------------------------------------X

RECEIVED
JUL 14 2014
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiffs Thomas Au, Tung Au , and Isabel Au, by their attorney Reid Rodriguez & Rouse, LLP, complaining of the Defendants, respectfully allege as follows:

## JURISDICTION AND VENUE

1. This is an action for breach of contract, fraud, unjust enrichment, breach of sections 50 and 51 of the New York Civil Rights Law, breach of fiduciary duty, quantum meruit, unpaid wages, and breach of New York General Business Law section 349(h).
2. This court has subject matter jurisdiction of this action under the doctrine of pendent jurisdiction and pursuant to section 28 U.S.C. Section 1332 because:

   a. There is complete diversity of citizenship between the plaintiffs and all defendants; and

   b. The amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.
3. The court has personal jurisdiction over the defendant Carryl Capital

Management LLC because the defendant conducts substantial business in the State of New York, and has maintained an office and principal place of business in New York, New York during the applicable times. The court has personal jurisdiction over the defendant Rudolph Carryl because the defendant conducts substantial business in the State of New York, and has maintained an office and principal place of business in New York, New York during the applicable times. Venue is proper within this district because the acts and practices complained of herein occurred within the Southern District of New York.

**STATEMENT OF CLAIM**

4. Plaintiff Thomas Au is a citizen of the state of New Jersey.

5. Plaintiffs Tung Au and Isabel Au are, respectively, the 90 year old mother and father of Plaintiff Thomas Au, and both reside in the state of California. Thomas Au, Tung Au and Isabel Au are sometimes collectively referred to as ("Plaintiffs")

6. Defendant Carryl Capital Management LLC ("CCM") is a corporation organized and existing under the laws of the state of New York.

7. Defendant Rudolph Carryl is an individual who resides in the state of New York and is the Chairman, Chief Executive Officer , founder and primary shareholder of Defendant Carryl Capital Management LLC. Defendant Rudolph Carryl and Defendant Carryl Capital Management LLC are collectively referred to as ("Defendants").

8. Defendant Rudolph Carryl disregarded corporate formalities for his own unjust enrichment , commingled investor funds with the funds of

Defendant Carryl Capital Management LLC, inadequately capitalized Defendant Carryl Capital Management LLC, to the extent that the Defendants can be called the alter ego of the other.

9. Defendant Rudolph Carryl exercised complete domination over Defendant Carryl Capital Management LLC in the transactions at issue and, in so doing, abused the privilege of doing business in the corporate form, thereby perpetrating a wrong that resulted in injury to the Plaintiffs.

**AS FOR THE FIRST CAUSE OF ACTION (Breach of Note)**

10. Plaintiffs repeat and reallege Paragraph"1" through "9" above, as set forth at length herein.

11. On or about August 10, 2012 Defendant Rudolph Carryl in his capacity as Chairman and Chief Executive Officer of Carryl Capital Management LLC for value received in the amount of One Hundred and Eighty Thousand Dollars ($180,000.00) executed on behalf of Carryl Capital Management LLC a note (Hereinafter referred to as "the Note") pursuant to which Carryl Capital Management LLC , as Borrower, promised to pay plaintiffs Tung Au and Isabel Au, as Lender, the amount of One Hundred and Eighty Thousand Dollars ($180,000.00), an interest accruing at three and 25/100 percent (3.25%), compounded quarterly.

12. The Note provided that "[t]this note shall mature and all outstanding principal and interest shall be due and payable by January 31, 2013."

13. The Note further provided, inter alia, that '[u]pon the occurrence of an Event of Default hereunder or in the event that this note is placed in the hands of an

attorney at law for collection after maturity or upon an Event of Default, Borrower shall pay all costs of collection, including, but not limited to, reasonable attorneys fees' incurred of such collection".

14. The Note provides that the "[b]orrower waives presentment, protest and demand and dishonor."

15. Prior to executing the Note, defendant Rudolph Carryl in his capacity as Chairman and Chief Executive Officer of Carryl Capital Management LLC, represented to plaintiff Thomas Au, who was acting as the agent of his parents plaintiffs Tung Au and Isabel Au, that the Note would be protected or covered by the between $1.5 million and $2.0 million of blocked funds of Carryl Capital Management LLC at Lazard Brothers, the prime broker of Carryl Capital Management LLC.

16. Based on this representation by defendants, plaintiff Thomas Au advanced an additional $15,000 to defendant Carryl Capital Management LLC.

17. The note has matured and all outstanding principal and interest are due and payable.

18. As a result of the foregoing, the plaintiffs Tung Au and Isabel Au have been damaged in the amount in excess of Two Hundred Thousand ($200,000.00).

**AS FOR THE SECOND CAUSE OF ACTION (BREACH OF CONTRACT)**

19. Plaintiffs repeat and reallege Paragraphs"1" through "18" above, as set forth at length herein.

20. In July 2010 Plaintiff Thomas Au's former supervisor from Value Line Defendant Rudolph Carryl and Plaintiff Thomas Au had a business meeting with Alan Rude, Helena Openshaw, and Robert Martorana.

21. At the time Defendant Rudolph Carryl wanted to know who among the group was able and interested in being partners with Defendant Rudolph Carryl and Helena Openshaw in Defendant Carryll Capital Management ("CCM"), a holding company of a hedge fund that Defendant Rudolph Carryl falsely represented that he had been running for several years.

22. Defendant Rudolph Carryl further took Plaintiff to the CCM's offices at 11O Wall Street and represented to Plaintiff Thomas Au supposed. historical returns, and based on Defendant Rudolph Carryl's historical returns that he would earn the market return and better over a period of time.

23. Plaintiff Thomas Au was only permitted to review the sales literature in the office.

24. On or about August 25, 2010 Defendant Rudolph Carryl represented to Plaintiff Thomas Au that he would have to buy a share of CCM in order to be included in the discussions with DuPasquier, a Paris based investment management firm

25. In September and October 2010, Defendant Rudolph Carryl introduced Plaintiff Thomas Au to DuPasquier as a prospective partner in CCM and introduced DuPasquier to Plaintiff Thomas Au as a prospective investor or buyer in CCM.

26. Concurrently, in September and October 2010 Defendant Rudolph Carryl falsely represented to Plaintiff Thomas Au that Helena Openshaw had invested $1,000,000.00 with Defendant Rudolph Carryl . In April 2014, Helen Openshaw informed from Plaintiff Thomas Au that the actual amount was approximately $250,000.

27. Defendant Rudolph Carryl solicited $125,000.00 from Plaintiff Thomas Au to capitalize CCM based on Defendant Rudolph Carryl's representation that Cliff

Walsh, another prospective partner, had put up $125,000.

28. On or about December 31, 2010, Defendant Rudolph Carryl solicited from Plaintiff Thomas Au another $25,000, representing that the money would be used to bring up the working capital balance of CCM to $500,000 and represented that this working capital balance would available to protect the investment of Plaintiff Thomas Au.

29. In May 2011, Defendant Rudolph Carryl invited Plaintiff Thomas Au to a series of meetings at 110 Wall Street and various New York City restaurants with Orlan Johnson, the then head of Securities Investors Protection Corporation ("SPIC ") and several of Mr. Johnson's colleagues.

30. After the meeting with Orlan Johnson, Defendant Rudolph Carryl informed Plaintiff Thomas Au that while they had been discussing Plaintiff Thomas Au's investing $100,000 at the CCM level and $500,000 for the hedge fund , now Defendant Rudolph Carryl stated that things were the other way around and Plaintiffs had to invest $500,000 at the CCM level and perhaps $100,000 in the hedge fund, because the involvement of Mr. Johnson et al had considerably increased the chance of CCM's success and Orlan Johnson asked him to spend more money on compliance.

31. This change was significant because the money at the corporate was subject to the startup business risk and the money in the hedge fund was subject to stock market risk.

32. Defendant Rudolph Carryl had successful track record managing money in the stock market but had an unproven track record managing businesses start-ups.

33. On or about June 1, 2011, Defendant Rudolph Carryl represented to Plaintiff Thomas Au upon the launch of CCM that Defendant Rudolph Carryl would return

the partners investment in CCM in lieu of salary and represented that his accountant Mark Stone had stated these disbursements would be tax free return of capital up to the level of the investments.

34. Based on the above representations, Plaintiffs Tung Au and Isabel Au raised their investment to $150,000 and Plaintiff Thomas Au withdraw $250,000 money from his IRA, bringing the Plaintiffs' total investment in CCM to Five Hundred Thousand Dollars ($500,000.00).

35. Plaintiff Thomas Au was advised by his tax account to repatriate the $250,000 to a roll-over IRA within sixty days of the withdrawal and to replace it with a fresh batch of $250,000, thereby maintaining Plaintiff Thomas Au's investment in CCM at $500,000 without incurring adverse tax consequences, because of the recycling of funds.

36. When Plaintiff Thomas Au began the recycling process on or about June 3, 2011, Defendant Rudolph Carryl falsely represented that he would return the $250,000 short loans to Plaintiff Thomas Au so that he would avoid the IRA withdrawal penalties.

37. On or about August 5, 2011, Defendant Rudolph Carryl returned only $100,000 of Plaintiff Thomas Au's $500,000 and requested an additional $200,000 to bring the Plaintiffs' total investment to $600,000. This meant that $150,000 out of the $250,000 IRA distribution was not returned timely within sixty days as represented by the Defendants.

38. Plaintiff Thomas Au complied with Defendant Rudolph Carryl's request for the additional $200,000, leaving a net investment of $600,000 with CCM.

39. Defendant Rudolph Carryl led Plaintiff Thomas Au to believe that these were

temporary stop gap measures pending the imminent launch of the Hedge Fund.

40. Defendant Rudolph Carryl represented to Plaintiff Thomas Au that during the recycling process, Plaintiff Thomas Au had to bring CCM's blocked funds above a minimum required amount by various counter parties before Defendant Rudolph Carryl could withdraw an equivalent amount from the blocked funds to return to Plaintiff Thomas Au .

41. Consequently, on or about September 23, 2011 Defendant Rudolph Carryl requested an additional $250,000 because he represented that he was in a three way race for a lease at 410 Park Avenue and he wanted to show the landlord the largest possible bank balance on the purported day of the lease signing, which would be September 28, 2011.

42. Defendant Rudolph Carryl falsely represented that he would return the $250,000 to Plaintiff Thomas Au by September 30, 2011 in time for the sixty day rollover deadline.

43. Then after Defendant Rudolph Carryl failed do so, he falsely represented that he would indemnify Plaintiff Thomas Au for the resulting $290,000 tax liability, of which he only paid $45,000 on February 10, 2012.

44. On or about December 2, 2011, Defendant Rudolph Carryl represented to Plaintiff Thomas Au that Defendant Rudolph Carryl needed an additional $250,000 for general corporate purposes in violation of his earlier representation that he needed only $600,000 from Plaintiff Thomas Au.

45. At this time Defendant Rudolph Carryl repeated an earlier misrepresentation that Helena Openshaw had invested $1,000,000, but the three plaintiffs gave Defendant

Rudolph Carryl an additional $25,000 in exchange for his representation that Plaintiff Thomas Au's investment would be divided 50-50 between the corporate level and the hedge fund level.

46. On or about June 10, 2012, Defendant Rudolph Carryl requested an additional $40,000 to $45,000 from Plaintiff Thomas Au as his one third share of the $140,000 lease extension at 570 Lexington Avenue.

47. Plaintiff Thomas Au initially declined to put up any new money but finally agreed that Defendant Rudolph Carryl could transfer the $40,000 to $45,000 from the purported hedge fund investment back to the corporate level.

48. At that time Defendant Rudolph Carryl admitted that his December 2011 representation to divide the Plaintiffs' investment 50-50 between the corporate level and hedge fund level had never been fulfilled and thereby false, inasmuch as all the Plaintiff 's investment had remained at the corporate level.

49. On August 8, 2012, Defendant Rudolph Carryl solicited another $150,000 from Plaintiff Thomas Au, representing that Defendant Rudolph Carryl had been informed by Lazard Brothers, CCM's prime broker that CCM needed to increase its blocked account from $1.5 million to $2.0 million.

50. On August 10, 2012 Defendant Rudolph Carryl represented that Plaintiff Thomas Au 's investment would be secured by the blocked account. (On or about April 2, 2014, Plaintiff Thomas Au discovered that this representation was false in that there was no such blocked account securing Plaintiff Thomas Au's investment.)

51. On August 10, 2012 Defendant Rudolph Carryl further represented that CCM was planning to launch the hedge fund in about sixty days and that Plaintiff Thomas Au

would be getting his investment back in the form of salary that would be enough to live on, which Plaintiff Thomas Au understood to believe between $50,000 to $75,000 annually..

52. Plaintiff Thomas Au told Defendant Rudolph Carryl that Plaintiff Thomas Au did not have $150,000 to invest but Plaintiff Thomas Au advanced an additional $15,000 on behalf of Tung and Isabel Au in exchange for CCM signing an $180,000 corporate note formalizing CCM's debt to Tung and Isabel Au.

53. In October 2012 Defendant Rudolph Carryl represented that CCM would be managing its own money ("the Common Fund:") and that CCM expected a large contribution in excess of $100 million from an Iranian client.

54. On or about November 28, 2012 Plaintiff Thomas Au started reporting to work at CCM at its new headquarters at 570 Lexington Avenue.

55. However, Plaintiff Thomas Au was never paid any salary by CCM. There were no infrastructure, no desk top computers, no landlines, and no Bloomberg or equivalent data feeds, all of which are ordinary and customary at any given hedge fund.

56. Although the actual operation differs from one to another, every hedge fund has certain essential ingredients.

57. A hedge fund is supposed to establish and maintain a pool of managed money in order to build a track record. All track records claimed must be supported by actual money under management, not just paper trades. The Common Fund was supposed to be this managed pool, but its existence was a lie.

58. A hedge fund will allow its investors to invest in its managed pool. In the case of CCM, this was supposedly the Common Fund.

59. There was a written agreement between CCM and Plaintiff Thomas Au for the Plaintiff's investment to be to divided 50-50 between the holding company's operational budget and this Common Fund.

60. Based on the (false) track record of superior returns, Plaintiff Tung Au expected that the plaintiffs would recoup any losses generated at the CCM level would be recouped through capital gains on the managed pool money in the Common Fund.

61. In actual fact, no money was invested in the non-existent Common Fund to hedge the Plaintiffs' investment as represented by Defendant Rudolph Carryl.

62. A hedge fund needs to employ a paid staff to manage its pool of money. The identification of staff members is an important investment consideration in a hedge fund.

63. Plaintiff Thomas Au was told that this staff would consist of Defendant Rudolph Carryl, Helena Openshaw, Dwain Carryl, Cliff Walsh, and Plaintiff Thomas Au and that all the staff would be paid a salary out of the money they had put up. (Dwain Carryl's name has been listed as President of CCM from September 2012 to present.)

64. As stated above, Plaintiff Thomas Au was never paid or otherwise remunerated, and Helena Openshaw, Dwain Carryl, Cliff Walsh complained to Plaintiff Thomas Au about not being paid by CCM.

65. As of January 2013, CCM included Plaintiff Thomas Au's name on its masthead on the website.

66. On or about March 26, 2014 and again on or May 13, 2014, Plaintiff Thomas Au requested the removal of his name from the masthead.

67. Despite these requests, CCM has not removed Plaintiff Thomas Au's name from its masthead as yet.

68. Plaintiff Thomas Au was admitted to St Roosevelt Hospital for depression on or about December 19, 2012 and remained so for eight days.

69. On or about October 2012, Plaintiff Thomas Au demanded the return of $350,000 from defendants, the amount he believed was Plaintiff Thomas Au's share in the Hedge Fund.

70. Defendant Rudolph Carryl responded that "he would get him the money within a reasonable period of time and that a reasonable period of time may be longer than usual because of Hurricane Sandy".

71. Defendant Rudolph Carryl failed to create a separate account for the Plaintiffs' investment or place it in a money market fund pending a hedge fund investment.

72. Defendants breached their promises to Plaintiff Thomas Au (i) to divide the Plaintiff's investment in a 50-50 split between the hedge fund and the corporate level, (ii) to establish a hedge fund that would have been competitive with the market return, and (iii) to pay the taxes on the distribution from Plaintiff Thomas Au's IRA when those taxes became due.

73. As a result of the foregoing breach of contract, the plaintiffs have been damaged in the amount in excess of One Million Dollars ($1,000,000.00).

**AS FOR THE THIRD CAUSE OF ACTION (Fraud)**

74. Plaintiffs repeat and reallege Paragraphs"1" through "73" above, as set forth at as set forth at length herein.

75. Upon information and belief, defendants fraudulently and knowingly caused the

Plaintiffs to invest in CCM by making intentional material misrepresentations and /or failing to provide material information. Misrepresentations and omissions of material fact included, but are not limited to the following :

a. In July 2010 Defendant Rudolph Carryl falsely represented that he had been running a hedge for several years, when in fact upon information and belief he had not been managing any money at the latest 2008;

b. In July 2010 Defendant Rudolph Carryl falsely represented to Plaintiff Thomas Au that the CCM's historical returns were based on real money when in fact the reported returns and investments were based on paper trades;

c. In September and October 2010 Defendant Rudolph Carryl falsely represented to Plaintiff Thomas Au that Helena Openshaw had invested $1,000,000 with Defendant Rudolph Carryl, when in fact she had investment approximately a quarter of such amount;

d. On or about June 3, 2011, Defendant Rudolph Carryl falsely represented that he would recycle to Plaintiff Thomas Au the loans made from his IRA account so that Plaintiff Thomas Au would avoid the tax penalties; Defendant Rudolph Carryl only returned $100,000 of the total $690,000 IRA money timely;

e. Defendant Rudolph Carryl falsely represented that he would indemnify Plaintiff Thomas Au for $290,000 tax liability, but Defendant Rudolph Carryl only paid $45,000 in February 10 2012 for his tax liability.

f. On or about December 2011, Defendant Rudolph Carryl falsely

represented to Plaintiff Thomas Au that his investment would be divided 50-50 between the corporate level and the hedge fund level, but the entire investment remained at the corporate level;.

g. In July 2010 Defendant Rudolph Carryl falsely represented to Plaintiff Thomas Au that defendants would establish a hedge fund business, but never established a viable hedge fund .

h. On or about August 10, 2012 Defendants falsely represented to Plaintiffs Tung and Isabel Au that Defendant Carryl Capital Management LLC would pay plaintiffs Tung Au and Isabel Au the amount of One Hundred and Eighty Thousand Dollars ($180,000.00), an interest accruing at three and 25/100 percent (3.25%), compounded quarterly.

76. Plaintiffs suffered serious injury as the proximate result of defendants' fraud and misrepresentations.

77. As a result of the foregoing fraud Defendants are liable to Plaintiffs for actual damages, costs, disbursements and attorneys' fees in an amount in excess of One Million Dollars ($1,000,000).

**AS FOR THE FOURTH CAUSE OF ACTION (Breach of Fiduciary Duty)**

78. Plaintiffs repeat and reallege Paragraphs"1" through "77" above, as set forth at as set forth at length herein.

79. There existed a fiduciary relationship between Plaintiffs and Defendants in that went beyond an arm's length relationship beyond that found in everyday commercial relationships.

80. Defendant Rudolph Carryl and Plaintiff Thomas Au had known each other

since 1983 and Defendant Rudolph Carryl was Plaintiff Thomas Au's supervisor at Value Line from 1984 to 1992.

81. At Value Line, everyone, including Plaintiff Thomas Au, looked up to Defendant Rudolph Carryl as a big brother to protect them from the company's owners, and admired Defendant Rudolph Carryl, who was the object of "hero worship", as someone who had beaten the system and risen to the top.

82. Plaintiffs Tung Au and Isabel Au are both over 90 and were acquainted with and had strong and favorable recollections of Defendant Rudolph Carryl received through their son Plaintiff Thomas Au.

83. This long - established relationship between the Plaintiffs and the Defendant Rudolph Carryl gave rise to a special relationship of higher trust and confidence and Plaintiffs relied upon Defendant Rudolph Carryl's advice and expertise.

84. Plaintiffs trusted Defendants to protect and hedge their investment by splitting and hedging it between the corporate and hedge levels and Defendants promised in a December 5, 2011 letter and elsewhere.

85. Defendants breached this fiduciary duty by not fulfilling the agreed upon protective measures in splitting and hedging the Plaintiff's' investment between the corporate and hedge levels.

86. As a result of the foregoing breach of fiduciary duty, Defendants are liable to Plaintiffs for actual damages, costs, disbursements and attorneys' fees in an amount in excess of One Million Dollars ($1,000,000.00).

**AS FOR THE FIFTH CAUSE OF ACTION (Quantum Meruit)**

87. Plaintiffs repeat and reallege Paragraphs"1" through "86" above, as set forth at length herein.

88. On or about November 2012 Defendants told Plaintiff Thomas Au to report to work at the then headquarters of 570 Lexington Avenue , 37th floor, on the last Tuesday of November to perform stock research services as a research director.

89. Defendants promised Plaintiff Thomas Au a salary sufficient to live on but never paid Plaintiff Thomas Au a salary.

90. Defendants are liable to Plaintiff Thomas Au for Quantum Meruit in an amount to be determined at trial.

**AS FOR THE SIXTH CAUSE OF ACTION (Unjust Enrichment)**

91. Plaintiffs repeat and reallege Paragraphs"1" through "90" above, as set forth at length herein.

92. Plaintiffs have provided funds to the Defendants.

93. Plaintiff Thomas Au has provided services to Defendants.

94. Defendants have been unjustly enriched by Plaintiffs' services and funds in an amount in excess of One Million Dollars ($1,000,000.00).

**AS FOR THE SEVENTH CAUSE OF ACTION (New York Civil Rights Law)**

95. Plaintiffs repeat and reallege Paragraphs"1" through "94" above, as set forth at length herein.

96. Defendants, without first obtaining Plaintiff' Thomas Au's written consent, release, authorization, or permission, have knowingly, intentionally and maliciously caused to be transferred, circulated, sold, distributed, used,

displayed, assigned, advertised, reproduced and/or published both directly and indirectly the name of Plaintiff Thomas Au.

97. That defendants have engaged in this selfish exploitation of plaintiff Thomas Au's identity and privacy for their own personal use and commercial gain.

(b) That defendants have unjustly profited from the commercial use, trade, or transfer of Plaintiff Thomas Au's name all to the detriment of Plaintiff Thomas Au.

(c.) That as a result of defendants' malicious actions they have unlawfully invaded the privacy of plaintiff Thomas Au in violation of sections 50 and 51 of the New York Civil Rights Law (McKinney 1976);

(d). The professional career of plaintiff Thomas Au will be irreparably injured and damaged if the defendants are permitted to continue to use the plaintiff Thomas Au for advertising and commercial purposes without the plaintiff Thomas Au's consent; and

99. The plaintiff Thomas Au has no adequate remedy at law and is entitled, pursuant to section 51 of the Civil Rights Law, to an injunction to prevent and restrain the further unauthorized use of his name, both without and within the state of New York and damages, costs, and attorneys' fees in an amount to be determined at trial.

## AS AND FOR AN EIGHTH CAUSE OF ACTION

## NEW YORK STATE GENERAL BUSINESS LAW SECTION 349
## (The Deceptive Trade Practices Act)

100. Plaintiffs repeat and reallege paragraphs "1" through "99" above, as

set forth at length herein.

101. Upon information and belief, defendants "conducted a business" and or "furnished a service" as those terms are defined in New York State General Business Law section 349 ("Deceptive Practices Act").

102. Upon information and belief, defendants, violated or was party to transactions which violated the Deceptive Trade Act by engaging in acts and practices that were misleading in a material way, unfair, deceptive, and contrary to public policy and generally recognized standards of business.

103. These practices include:

a. In July 2010 Defendant Rudolph Carryl falsely represented that he had been running a hedge for several years, when in fact upon information and belief he had not been managing any money since at the latest 2008;

b. In July 2010 Defendant Rudolph Carryl falsely represented to Plaintiff Thomas Au that the CCM's historical returns were based on real money when in fact the reported returns and investments were based on paper trades;

c. In September and October 2010 Defendant Rudolph Carryl falsely represented to Plaintiff Thomas Au that Helena Openshaw had invested $1,000,000 with Defendant Rudolph Carryl, when in fact she had investment approximately a quarter of such amount;

d. On or about June 3, 2011, Defendant Rudolph Carryl falsely

represented that he would to reimburse Plaintiff Thomas Au the loans made from his IRA account so that Plaintiff Thomas Au would avoid the tax penalties , Defendant Rudolph Carryl only returned $100,000 of the total $690,000 IRA money timely;

e. Defendant Rudolph Carryl falsely represented that he would indemnify Plaintiff Thomas Au for $290,000 tax liability, but Defendant Rudolph Carryl only paid $45,000 in February 10 2012 for his tax liability.

f. On or about December 2011, Defendant Rudolph Carryl falsely represented to Plaintiff Thomas Au that his investment would be divided 50-50 between the corporate level and the hedge fund level, but the entire investment remained at the corporate level;.

g. In July 2010 Defendant Rudolph Carryl falsely represented to Plaintiff Thomas Au that defendants would establish a hedge fund business, but never established a hedge fund .

h. On or about August 10, 2012 Defendants falsely represented to Plaintiffs Tung and Isabel Au that Defendant Carryl Capital Management LLC would pay plaintiffs Tung Au and Isabel Au the amount of One Hundred and Eighty Thousand Dollars ($180,000.00), an interest accruing at three and 25/100 percent (3.25%), compounded quarterly.

104. The defendants knew that their conduct was directed to one or more elderly persons.

105. The defendants' conduct was in willful disregard of the rights of an elderly

person

106. The defendants' conduct caused an elderly person or persons to suffer severe loss source of income, substantial loss of property set aside for retirement or for personal and family care and maintenance, substantial loss of payments received under a pension or retirement plan or a government benefits program; or assets essential to the health or welfare of the elderly person.

107. Plaintiffs Tung and Isabel Au were substantially more vulnerable to the defendants conduct because of age, poor health, infirmity, impaired understanding, restricted mobility, or disability, and actually suffered physical, emotional, or economic damage resulting from the defendant's conduct.

108. Plaintiff Thomas Au actually suffered physical, emotional, or economic damage resulting from the defendant's conduct.

109. Plaintiffs suffered serious injury as the proximate result of defendants' deceptive practices.

110. As a result of the Defendants breach of the Deceptive Practices Act Defendants are liable to Plaintiffs for actual damages, costs, disbursements and attorneys' fees in an amount in excess of One Million Dollars ($1,000,000.00).

**AS AND FOR A NINTH CAUSE OF ACTION**

(NY Labor Law section 190)

111. Plaintiffs repeat and reallege paragraphs "1" through "110" above as set

forth at length herein.

112. At all relevant times, Plaintiff Thomas Au was an "employee" of defendants , who were "employers", as those terms are defined by NY Labor Law section 190 et seq.

113. Defendants have willfully, intentionally and deliberately failed to pay Plaintiff Thomas Au wages owed.

114. Defendants' failure to pay Plaintiff Thomas Au said wages constitutes a willful violation of NY Labor Law section 190 et seq.

115. As a result of the foregoing, Defendants are liable to Plaintiff Thomas under New York State Labor Law Section 198(1-1) for all unpaid wages plus liquidated damages of Twenty-Five Percent of the unpaid wages, plus reasonable attorneys' fees in an amount to be determined at trial.

**WHEREFORE**, Plaintiffs pray that this Court grants judgment to them containing the following relief:

(i) Awarding Plaintiffs damages on their claims in an amount to be determined at trial to compensate Plaintiffs for direct, compensatory, punitive, general, special, consequential, incidental, exemplary and aggravated damages;

(ii) Awarding Plaintiffs damages, plus prejudgment interest, for breach of contract in an amount in excess of One Million Dollars ($1,000, 000.00);

(iii) Awarding Plaintiffs damages, plus prejudgment interest, for breach of contract in an amount in excess of One Million Dollars ($1,000,

000.00);

(iv) Awarding Plaintiffs damages, plus prejudgment interest, for breach of fiduciary of duty in an amount in excess of One Million Dollars ($1,000, 000.00);

(v) Awarding Plaintiffs damages, plus prejudgment interest, for unjust enrichment in an amount in excess of One Million Dollars ($1,000, 000.00);

(vi) Awarding Plaintiffs damages, plus prejudgment interest, for quantum meruit in an amount to be determined at trial;

(vii) Awarding Plaintiffs damages, plus prejudgment interest, for violation of N.Y. General Business Law section 349 (h) in an amount in excess of One Million Dollars ($1,000, 000.00);

(viii) Awarding Plaintiff Thomas Ay damages, plus prejudgment interest, for unpaid wages in an amount to be determined at trail;

(ix) Awarding Plaintiff Thomas Au liquidated damages in an amount of twenty-five percent of the total wages due pursuant to section 198 of the New York labor law;

(x) Awarding Plaintiffs' statutory damages in an amount to be determined at trial;

(xi) Granting Plaintiffs their costs, disbursements, and attorneys' fees incurred in this action to the fullest extent permitted by law, including, but not limited to the New York labor law, the New York Deceptive Business Act, and the New York Civil Rights Law;

(xii) Award actual damages from defendants' violation of the New York Civil Rights Law and Plaintiff Thomas Au's right of privacy;

(xiii) Enjoin defendants from violating of the New York Civil Rights Law and Plaintiff Thomas Au's right of privacy;

Enjoin defendants from engaging in deceptive acts and practices that affect consumers in New York State under N.Y. General Business Law section 349 (h); and

(xiv) Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs request a jury trial on all issues triable by jury.

Respectfully submitted,

Reid Rodriguez & Rouse, LLP
Attorney for Plaintiffs
By: Gregory L. Reid, Esq.
1120 Avenue of the Americas
Fourth Floor
New York, New York 10036
Tel. (212) 626-6785
Facsimile (212) 626-6788
Email: Glreidesq@gmail.com

Dated: July 8, 2014
New York, New York